**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Hector Villa, | No. CV-17-03557-PHX-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| State of Arizona, et al., | |
| Defendant. | |

At issue is Defendant State of Arizona's Motion for Summary Judgment (Doc. 36), to which Plaintiff Hector Villa has filed a Response (Doc. 43), and Defendant has filed a Reply (Doc. 44). For the reasons set forth below, Defendant's Motion for Summary Judgment is granted in part and denied in part.

## I.    BACKGROUND

Plaintiff Hector Villa brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, alleging sex discrimination, national origin discrimination, and retaliation against his former employer, the Arizona Department of Corrections ("ADC") of the State of Arizona. (Doc. 1 at 1). Plaintiff is a heterosexual male, and a Mexican-American citizen of the United States. (Defendant's Statement of Facts ("DSOF"), Doc. 35 ¶¶ 36, 67; Plaintiff's Statement of Facts ("PSOF"), Doc. 42 ¶¶ 84–85, 87). From 2007 to 2017, Plaintiff worked at ADC as a Correctional Officer (CO) II at the Arizona State Prison Complex (ASPC) – Lewis. (DSOF ¶¶ 1, 50; PSOF ¶¶ 1, 92, 166). Plaintiff was assigned to the Eagle Point unit, which is across the street from and physically outside of the main

prison complex. (DSOF ¶ 12; PSOF ¶¶ 12, 93).

### A. Plaintiff's September 25, 2014 Complaint Against CO II Deem

In 2014, Plaintiff worked with another CO II named David Deem at the Eagle Point unit. (DSOF ¶ 11; PSOF ¶ 11). Plaintiff testified in his deposition that Deem called him slurs including "Italian n****r," "wet back," "chomo" (prison slang for a child molester), and "faggot" on a "daily basis" and "all the time." (PSOF ¶¶ 95, 97). On September 25, 2014, Plaintiff filed an internal complaint alleging that Deem had harassed him by, among other things, calling him a "fag" and a "Sicilian n****r" and by saying he was going to call the INS to have Plaintiff deported. (DSOF ¶ 10; PSOF ¶ 10; *see* Doc. 35-1 at 39–40). This internal complaint states that inmates and several employees of ADC—including Officers Flores, Robertson, Kingsland, Phillips, and Young—witnessed this harassment. (Doc. 35-1 at 39–40). Although not mentioned in Plaintiff's September 25, 2014 complaint, Officer Anderson states in his Declaration that he witnessed Deem call Plaintiff a "faggot" and a "Sicilian n****r." (Doc. 42-6 at 23). According to Officer Anderson, Plaintiff responded to these comments by telling Deem, "that isn't cool." (*Id.*).

Plaintiff also complained to a supervisor, Sgt. Abker, about CO II Deem's slurs on September 25, 2014. (PSOF ¶¶ 99-100; Doc. 42-5 at 5). That same day, Sgt. Abker submitted an information report regarding Deem's alleged harassment of Plaintiff to ADC Lieutenant Lunka, stating:

> On the above date and approximate time COII Villa advised me that COII Deem had been making racial comments towards him. Comments like "I am going to deport you" and that he was "a faggot, gay, a homosexual" along with other derogatory comments. COII Villa advised me that this has been going on for the last few weeks and that he has approached Deem about the comments, stating that he did not approve of them and that they were disrespectful towards him. He also advised that COII Deem made these comments around other staff and inmates and that now inmates on the yard have been making inappropriate jokes towards him. End of report.

(PSOF ¶ 100; Doc. 42-5 at 5). On September 29, 2014, Chris Moody, the Warden of ASPC-Lewis, reassigned Deem to the Morey unit within the main complex. (DSOF ¶ 15; PSOF ¶ 15; Doc. 35-1 at 76). Despite Deem's reassignment, however, Plaintiff states that he still "ran into him on a daily basis" at the complex. (PSOF ¶¶ 15, 125–26).

Leola Baker, the Lead Equal Opportunity Liaison at ASPC-Lewis, forwarded Plaintiff's September 2014 complaint to Eric Abt, an Equal Opportunity Coordinator in ADC's Central Office. (DSOF ¶ 16; PSOF ¶ 16). After Abt recommended that a fact-finding investigation be conducted, Baker assigned another Equal Opportunity Liaison, Sgt. Tyrrell, to do the fact-finding. (DSOF ¶¶ 17–18; PSOF ¶¶ 17–18). Sgt. Tyrrell interviewed Deem in early November 2014. (DSOF ¶19; PSOF ¶ 19). At this interview, Deem denied calling Plaintiff an "Italian N****r, faggot, gay, or homosexual" and denied that he ever said he was going to call the INS to have Plaintiff deported. (Doc. 35-1 at 63).[1] In December 2014, Sgt. Tyrrell interviewed Plaintiff. (DSOF ¶ 20; PSOF ¶ 20). Plaintiff told Sgt. Tyrrell that the September incident was not the only time he and Deem had a verbal altercation because Deem "always has something to say like your [sic] gay or call me a faggot." (Doc. 35-1 at 65). When asked by Sgt. Tyrrell whether anything has happened since Deem was reassigned, Plaintiff responded that individuals had approached him to tell him that Deem had been talking negatively about him, calling him a paper dropper (prison slang for someone who reports misconduct), and stating that Plaintiff lied about what happened. (Id. at 66; see PSOF ¶ 131).

---

[1] In response to Sgt. Tyrrell's question during this Fact Finding Investigation asking whether Deem had ever had an inappropriate conversation with Plaintiff, Deem stated: "No way, that guy lies a lot." (Doc. 35-1 at 63). When asked to describe his relationship with Plaintiff, Deem said that he thought that he and Plaintiff "were cool." (Id.). Then, when asked whether he had ever had a conversation with Plaintiff to which Plaintiff could have possibly taken offense to, Deem stated:

> One time I heard him talking to an inmate in Spanish. I asked him if he was Mexican. He stated no he was Italian. I said oh my wife is Italian. He said well actually I am Sicilian. I then said oh are you part black because the Africans invaded Sicily. He said no I'm part Arabic. And that was the end of the conversation.

(Id.). It does not appear that Sgt. Tyrrell asked Deem why he would make these comments or otherwise ask him to explain the comments. (Id.; PSOF ¶ 111).

In December 2014, Sgt. Tyrrell also interviewed CO II Robertson, one of the witnesses to the alleged harassment identified in Plaintiff's internal complaint. (DSOF ¶ 20; PSOF ¶ 20). Although CO II Robertson told Sgt. Tyrrell that he saw Deem "get up in CO II Villa[']s face" and then "heard CO II Deem state to CO II Villa that I don't like your face and I just want to punch you in the face," he also recalled that both men were laughing at the time so he "thought they were kidding around." (Doc. 35-1 at 67). In addition, Robertson stated that that he had not heard Deem call Plaintiff an "Italian N****r or gay or a faggot." (*Id.* at 68). When asked by Sgt. Tyrrell of his opinion of Deem, Robertson responded that Deem "is a little rough around the edges," and that Deem was "always going to have problems where ever he goes." (Doc. 35-1 at 68). Robertson also stated that Deem likes "to joke a lot but I don't think others have his same sense of humor." (*Id.*).

In February 2015, Baker and Jacqueline Hill, an Equal Opportunity Coordinator in the Central Office, determined that further investigation was needed to complete the Fact Finding. (DSOF ¶ 21; PSOF ¶ 21). Consequently, on February 27, 2015, Baker interviewed CO II Flores and re-interviewed CO II Robertson. (DSOF ¶ 22; PSOF ¶ 22). When asked whether he recalled the incident in September between Plaintiff and Deem, Flores responded that he did and stated that Deem had made some sort of racial comment to Plaintiff along the lines of calling border patrol to deport Plaintiff to Mexico. (Doc. 35-1 at 71). Flores noted, however, that Plaintiff "just laughed" in response to these and other racial comments made by Deem. (*Id.*). Flores also stated that he had never heard Deem call Plaintiff a "Sicilian N****r" or tell Plaintiff that he would punch him in the face. (*Id.*). On February 27, 2015, Baker re-interviewed Robertson, and asked him to clarify what he meant when he said in his previous interview that Deem would have problems wherever he goes. (Doc. 35-1 at 73). Robertson stated that he "meant only in general terms" that Deem might have problems with other staff. (*Id.*). Robertson also stated in his February interview that he couldn't say that he had *not* heard Deem make any racial or cultural comments, but noted that the recipient of the comments didn't show signs of being

offended. (*Id.*). Baker then prepared a written report summarizing these interviews, which was sent to Hill, Abt, and Warden Moody. (*Id.*). There is no indication that ADC interviewed any of the other witnesses listed in Plaintiff's September 2014 complaint, including Officers Kingsland, Phillips, or Trinity Young. *Compare* (Doc. 35-1 at 39–40 (Plaintiff's September 25, 2014 complaint)), *with* (Doc. 35-1 at 62–68 (Sgt. Tyrrell's Fact-Finding Report)). Based on this report, on March 17, 2015 Warden Moody informed Plaintiff that the investigation did not establish that Plaintiff was subjected to discrimination. (DSOF ¶ 23; PSOF ¶ 23).

In his deposition, Plaintiff testified that he had no reason to believe that Deem was sexually or physically attracted to him. (DSOF ¶¶ 33–34; PSOF ¶¶ 33–34). Plaintiff also thought that when Deem called him a fag or gay, Deem was being anti-homosexual. (DSOF ¶ 35; PSOF ¶ 35). Plaintiff testified that he thinks it was sex discrimination for Deem to refer to him as a homosexual because Plaintiff is straight and Deem was calling him the opposite of straight. (DSOF ¶ 36; PSOF ¶ 36).

## B.     Plaintiff's March 30, 2015 Complaint Against Deem

On March 30, 2015, Plaintiff filed an internal complaint expressing disagreement with the determination on his previous complaint, and alleging that CO II Deem was continuing to harass him in retaliation for that complaint. (DSOF ¶ 37; PSOF ¶ 37). In this complaint, Plaintiff states that "CO II Deem has made every attempt available to slur my name to other officers" by labeling him as a "paper dropper," "gay," "crazy" and a "liar." (Doc. 35-1 at 117). Plaintiff's complaint further states that he continues "to be harassed by CO II Deem through other employees who associate with this officer," and feels stressed when he runs into Deem in the complex because Deem "keeps his fist clenched and looks at [Plaintiff] with an angry facial expression." (*Id.*). Plaintiff also pointed out that he asked Officers Kingsland and Trinity Young—two of the witnesses identified in his September 25, 2014 complaint—if anyone had pulled them aside to discuss the incidents with Deem, but each of them stated that they were not questioned in the investigation. (*Id.* at 118).

Plaintiff's March 30, 2015 complaint was forwarded to Hill in the Equal

Opportunity Unit at Central Office, and, after consultation with Hill, Baker assigned Lt. Jacole Swirsky to do a Fact-Finding investigation. (DSOF ¶¶ 38–39; PSOF ¶¶ 38–39). Lt. Swirsky first interviewed Plaintiff, who stated that he was being harassed by Deem through other employees. (Doc. 35-1 at 122).[2] In response to Lt. Swirsky's question asking if Deem had "said or done anything to you that you perceived as retaliation since the first case," Swirsky's report indicates that Plaintiff responded "no." (*Id.*; *see also* DSOF ¶ 41). However, Plaintiff told Lt. Swirsky that CO II Hurles had told Plaintiff that she overhead Deem telling everybody that Plaintiff was a "paper dropper" and "can't be trusted." (Doc. 35-1 at 122; *see also* PSOF ¶ 41). Lt. Swirsky next interviewed Hurles, who told Lt. Swirsky that she had not witnessed Deem retaliate against CO II Villa in any way. (Doc. 35-1 at 124).[3] Hurles did mention, though, that she had overhead Deem making comments about Plaintiff at the range such as "he messed things up for me" and "now I can't go to Perryville." (*Id.* at 123–24).[4] Lt. Swirsky then interviewed Deem, who denied clenching his fists while in Plaintiff's presence, threatening to punch Plaintiff, or speaking to anyone about Plaintiff or the original complaint filed by Plaintiff against him. (*Id.* at 125). When asked by Lt. Swirsky what he had said when he was reportedly speaking about Plaintiff and the original complaint while at the range, Deem responded that he didn't remember. (*Id.*). It does not appear that Lt. Swirsky interviewed any of the other witnesses listed in Plaintiff's March 30, 2015 complaint, including Officers Anderson, Kingsland, Robertson, and Young. (Doc. 35-1 at 117, 121–26).

After reviewing the summaries of Lt. Swirsky's interviews with Plaintiff, Deem, and Hurles, Warden Moody initiated an Administrative Inquiry in which Deem was presented with allegations to respond to in writing. (DSOF ¶ 47; PSOF ¶ 47). Based on the

---

[2] In response to Plaintiff's statement that he was being harassed by Deem through other employees, Lt. Swirsky asked who these employees were. (Doc. 35-1 at 122). Lt. Swirsky's report states that Plaintiff couldn't give her an answer to this question. (*Id.*).

[3] Plaintiff objects to this statement on the grounds that it is inadmissible hearsay. (PSOF ¶ 44).

[4] CO II Hurles stated, however, that Deem did not mention a specific name when making these comments. (Doc. 35-1 at 124).

information obtained in the Administrative Inquiry and the Fact-Finding, Warden Moody determined that there was insufficient evidence to sustain charges. (DSOF ¶ 48; PSOF ¶ 48; Doc. 35-1 at 127). Warden Moody took no formal disciplinary action against officer Deem based on Plaintiff's allegations because he determined that those allegations were not supported by information obtained in ADC's investigations. (Doc. 35-1 at 77). However, Warden Moody did recommend that Deem be given an entry on his performance evaluation reminding him to maintain professionalism. (DSOF ¶ 49; PSOF ¶ 49). Warden Moody later terminated Deem's employment in 2016 after an investigation in an unrelated case indicated that Deem engaged in misconduct. (Doc. 35-1 at 77).

### C.     Plaintiff's March 13, 2015 EEOC Charge

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on March 13, 2015 alleging that he had been discriminated and retaliated against because of his sex and national origin in violation of Title VII of the Civil Rights Act of 1964. (DSOF ¶¶ 62–63; PSOF ¶¶ 62–63; Doc. 35-1 at 33). Plaintiff's EEOC Charge specifically alleges that Deem had subjected him to a hostile work environment by telling Plaintiff he would get him deported to Mexico, and calling Plaintiff a "chomo" (child molester), "Italian n****r" and a "faggot." (Doc. 35-1 at 33). On July 7, 2017, the EEOC issued a Dismissal and Notice of Right to Sue to Plaintiff indicating that it was closing its file on the charge because, "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes." (Doc. 35-1 at 37). The EEOC also stated that its Dismissal and Notice of Right to Sue "does not certify that the respondent is in compliance with the statutes." (*Id.*).

### D.     Plaintiff's January 25, 2016 Complaint Against Barreras, the Resulting Investigation, and Plaintiff's Interactions with Hibbard

On January 25, 2016, Plaintiff filed a complaint alleging misconduct by Sgt. Barreras, supervisor of the Fire Crew at ASPC-Lewis. (DSOF ¶ 72; PSOF ¶ 72). In this complaint, Plaintiff alleged that during fire crew exercises in October 2015 he "observed Sgt. Barreras [in] what appeared to be horseplay with the inmates" by touching

one or more of them "in the buttocks area with a walking stick." (*Id.*). In his deposition, Plaintiff indicated that Barreras touched him in this manner, as well. (PSOF ¶ 142). Plaintiff further stated that Barreras had called Plaintiff and other inmates on the prison's fire crew "homos," "fags," and "faggots," and had called Plaintiff a "structure fag" because Plaintiff had worked as a structure firefighter for a former employer. (DSOF ¶ 72; PSOF ¶¶ 72, 141).

After he complained of Barreras' alleged discriminatory misconduct, Plaintiff claims that Barreras walked through the control room where Plaintiff was working, punched the window, and ran his finger across his throat in a manner which indicated to Plaintiff that Barreras was going "to get" him. (PSOF ¶ 150). Plaintiff also alleges that two supervisors, Sgt. Hilnojosa and fire training supervisor "Jake," told Plaintiff he was not selected for a full-time position on the prison's fire crew based on his complaints of discrimination. (PSOF ¶ 151).[5] Plaintiff wanted a full-time position on the fire crew because it offered more opportunities to earn overtime pay. (PSOF ¶ 152). Based on this conversation, Plaintiff contends that he went back to the EEOC to file another Charge of Discrimination, but was told by EEOC investigator Jose Effio that filing a new EEOC Charge was unnecessary based on the scope of his original charge. (PSOF ¶ 154).

The Criminal Investigations Unit of ADC's Office of Inspector General conducted an investigation but did not find any indication that any of the activity reported by Plaintiff was criminal in nature. (DSOF ¶ 73; PSOF ¶ 73). During Special Investigator John Armstrong's investigation into whether Plaintiff's allegations evidenced criminal conduct, Armstrong asked Plaintiff "why he felt this was an EEOC issue instead of [a] normal supervisory issue which he would normally report to this supervisor." (Doc. 42-6 at 4). Plaintiff responded that "he was afraid of retaliation from Sgt. Barreras," his supervisor for the Fire Crew. (*Id.*). Plaintiff also told Armstrong that he did not know who to tell about Barreras' alleged misconduct because he did not "trust" Lewis Complex Deputy Warden Hibbard after Hibbard had made racial comments specifically mentioning "Mexicans."

---

[5] Plaintiff states that Jake told him: "You're a snitch, a paper dropper. Like that's who you're labeled as so we're kind of afraid to hire you." (PSOF ¶ 152).

(Doc. 42-6 at 2; PSOF ¶ 156). Specifically, Plaintiff claims that Hibbard called him a "brown dick," and stated to Plaintiff on December 23, 2015: "Here I am making burritos, if I had a bunch of Mexicans working for me I would be done already but here I am a white boy still making burritos." (PSOF ¶¶ 156, 161; Doc. 42-6 at 4). When asked for more details regarding this incident at his deposition, Plaintiff testified that Hibbard told him, "Villa, you Mexican, go make me some God damn burritos." (PSOF ¶ 157). Plaintiff then claims he told Hibbard that this remark made him sound racist, to which Hibbard told Plaintiff either "shut up, you Mexican," or "go back to work, you Mexican." (PSOF ¶ 158). Plaintiff also alleges that Hibbard refused his request for a promotion because Plaintiff was "a brown dick." (PSOF ¶¶ 159–61).

### E.    Plaintiff's September 7, 2017 Resignation

On September 7, 2017, Plaintiff gave ADC two-weeks' notice of his resignation by submitting a form memo on which he checked the statement, "I hereby voluntarily resign/retire from my position with the Arizona Department of Corrections." (DSOF ¶ 50; PSOF ¶ 50; Doc. 35-1 at 129). On this resignation form, Plaintiff listed "Daughter (caring for child)" as the reason for his resignation, but Plaintiff denies that this was the true reason for his resignation. (DSOF ¶ 51; PSOF ¶ 51; Doc. 35-1 at 129).

Although Plaintiff's wife had just given birth to a baby daughter a month prior to Plaintiff's resignation, Plaintiff testified at his deposition that he gave a false reason for resigning in his notice of resignation because he was worried about retaliation. (DSOF ¶¶ 52, 55; PSOF ¶¶ 52, 55). Specifically, Plaintiff believed that if he revealed that discriminatory harassment was the true reason for his resignation, ADC would retaliate against him by giving him poor recommendations to prospective employers. (PSOF ¶ 168). According to Plaintiff, he was "forced to quit the Department as a matter of self-respect" because he could no longer endure the environment. (PSOF ¶ 166). While Plaintiff admitted that he was no longer facing any harassment from Officer Deem at the time of his resignation, he claimed that he was still facing discriminatory harassment and retaliation at Eagle Point Unit in the form of "racial slurs and false allegations regarding his sexuality."

(DSOF ¶ 56; PSOF ¶¶ 56, 166). In addition to complaining of retaliation for reporting Barreras' alleged discriminatory misconduct, Plaintiff states that he feared inmates would physically assault him because they had heard Deem call Plaintiff a "chomo." (PSOF ¶¶ 56, 133, 150–54). Further, an inmate told Plaintiff, "I heard from Deem that you're a faggot" as he pulled his pants down to expose himself to Plaintiff. (PSOF ¶ 134).

### F.    The Present Action

On October 5, 2017, Plaintiff filed the instant action. (Doc. 1). Plaintiff alleges that the discriminatory harassment he faced forced him to resign, and that Defendant tolerated the discriminatory work environment by failing to adequately investigate his complaints of harassment and retaliation or appropriately discipline employees. (Doc. 1 at 3).[6] Defendant denies that any unlawful discriminatory or retaliatory conduct occurred, and raises the affirmative defense that Plaintiff failed to exhaust administrative remedies. (Doc. 8 at 1– 2). Defendant also affirmatively defends on the ground that it reasonably responded to Plaintiff's complaints per *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). (Doc. 8 at 1–2). On December 21, 2018, Defendant filed the Motion for Summary Judgment at issue, which argues that Plaintiff failed to exhaust administrative remedies, was not constructively discharged, and that his harassment claims are insufficient to find Defendant liable. (Doc. 36). On February 12, 2019, Plaintiff filed his Response in Opposition to Defendant's Motion for Summary Judgment. (Doc. 43).[7] Defendant then filed its Reply on February 28, 2019. (Doc. 44). The Court heard oral argument in this matter on April 24, 2019.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must

---

[6] As required, Plaintiff filed his lawsuit within 90 days of receipt of the EEOC's July 7, 2017 Dismissal and Notice of Right to Sue letter. (Doc. 35-1 at 37).

[7] Plaintiff's Response (Doc. 43) is deemed timely. (*See* Docs. 38, 41).

support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id*. 56(c)(1)(A-B). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of demonstrating to the Court the basis for the motion and the elements of the cause of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id*. at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id*. A material fact is any factual issue that may affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 248. The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id*. at 247–48. However, in the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

At the summary judgment stage, the Court's role is to determine whether there is a genuine issue available for trial. There is no issue for trial unless there is sufficient evidence in favor of the non-moving party for a jury to return a verdict for the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 249-50. "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted." *Id.* (citations omitted).

## III. ANALYSIS

Defendant argues that it is entitled to summary judgment on each of Plaintiff's claims[8] because: (1) Plaintiff failed to exhaust his administrative remedies as to all of his claims, except those alleging that he was harassed by Deem; (2) Plaintiff's harassment claims resulting from Deem's conduct are devoid of support; and (3) Defendant reasonably responded to Plaintiff's complaints.

### A. Whether Plaintiff Exhausted Administrative Remedies as to Each of His Claims

Prior to bringing suit on Title VII claims, a plaintiff must exhaust administrative remedies by filing a timely charge with the EEOC or the appropriate state agency. *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1099 (9th Cir. 2002) (citing *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 899 (9th Cir. 1994); 42 U.S.C. § 2000e-5(b)). This administrative charge requirement affords the agency an opportunity to investigate the charge, gives the charged party notice of the claim, and narrows the issues "for prompt adjudication and decision." *Id.* (citing 42 U.S.C. § 2000e-5(b); *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995)).

"The jurisdictional scope of a Title VII claimant's court action depends upon the scope of both the EEOC charge and the EEOC investigation." *Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir. 1990) (citing *Green v. Los Angeles Cty. Superintendent of Sch.*, 883 F.2d 1472, 1476 (9th Cir. 1989)). "Subject matter jurisdiction extends over all allegations of discrimination that either 'fell within the scope of the EEOC's *actual* investigation or an EEOC investigation which *can reasonably be expected* to grow out of the charge of

---

[8] Plaintiff does not allege in his Response (Doc. 43) any claims from his Complaint on which Defendant did not move for summary judgment. Accordingly, the Court deems the claims discussed in this Order the totality of the claims alleged in the Complaint. These claims are: (1) constructive discharge; (2) hostile work environment based on physical and verbal harassment by Barreras; (3) hostile work environment based on harassment by Hibbard; (4) failure to promote in retaliation for filing complaints of discrimination; (5) hostile work environment based on sexual harassment by Deem; (6) retaliation-based hostile work environment; and (7) hostile work environment based on national origin harassment by Deem. The Court makes this observation because Plaintiff did not split up his Complaint into claims. (*See* Doc. 1).

discrimination.'" *B.K.B.*, 276 F.3d at 1100 (quoting *Farmer Bros. Co.*, 31 F.3d at 899) (emphasis in original) (internal quotations omitted). Accordingly, "[w]hen an employee seeks judicial relief for incidents not listed in his original charge to the EEOC, the judicial complaint nevertheless may encompass any discrimination like or reasonably related to the allegations of the EEOC charge, including new acts occurring during the pendency of the charge before the EEOC." *Oubichon v. N. Am. Rockwell Corp.*, 482 F.2d 569, 571 (9th Cir. 1973).

"In determining whether an allegation under Title VII is like or reasonably related to allegations contained in a previous EEOC charge, the court inquires whether the original EEOC investigation would have encompassed the additional charges." *Green*, 883 F.2d at 1476 (citations omitted); *see also B.K.B.*, 276 F.3d at 1100 ("In determining whether a plaintiff has exhausted allegations that she did not specify in her administrative charge, it is appropriate to consider such factors as the alleged basis of the discrimination, dates of discriminatory acts specified within the charge, perpetrators of discrimination named in the charge, [] any locations at which discrimination is alleged to have occurred[,]" and whether the plaintiff's "claims are consistent with the plaintiff's original theory of the case."). However, "if the two claims are not so closely related that a second administrative investigation would be redundant, the EEOC must be allowed to investigate the dispute before the employee may bring a Title VII suit." *Stache v. Int'l Union of Bricklayers & Allied Craftsmen, AFL-CIO*, 852 F.2d 1231, 1234 (9th Cir. 1988) (citing *Brown v. Puget Sound Elec. Apprenticeship & Training Tr.*, 732 F.2d 726, 730 (9th Cir. 1984)). Thus, whether a "plaintiff has in fact exhausted his or her administrative remedies depends on an analysis of the 'fit' between the administrative charges brought and investigated and the allegations of the subsequent judicial complaint." *Ong v. Cleland*, 642 F.2d 316, 318 (9th Cir. 1981).

Finally, "[t]he remedial purpose of Title VII and the paucity of legal training among those whom it is designed to protect require charges filed before the EEOC to be construed liberally." *Green*, 883 F.2d at 1476 (citation omitted). "The administrative charge required

by Title VII does not demand procedural exactness. It is sufficient that the EEOC be apprised, in general terms, of the alleged discriminating parties and the alleged discriminatory acts." *Chung v. Pomona Valley Cmty. Hosp.*, 667 F.2d 788, 790 (9th Cir. 1982) (citation omitted). Although district courts must "'construe the language of EEOC charges with utmost liberality since they are made by those unschooled in the in the technicalities of formal pleading,' . . . there is a limit to such judicial tolerance when principles of notice and fair play are involved." *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 636 (9th Cir. 2002) (quoting *B.K.B.*, 276 F.3d at 1100).

"The crucial element of a charge of discrimination is the factual statement contained therein." *B.K.B.*, 276 F.3d at 1100 (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 462 (5th Cir. 1970)). The factual statement in Plaintiff's March 13, 2015 EEOC charge reads:

> Beginning on September 22, 2014, Correctional Officer II Deem has subjected me to a hostile work environment to include but not limited to telling me that he is going to deport me back to Mexico, calling me an 'Italian niggger' [sic] and a 'faggot[.]' Deem also called me a 'chomo' (Child Molester)[.] These comments were made several times. On September 25, 2014[,] I filed an internal EEO complaint. As a result[,] Officer Deem has been transferred to a different yard. However, I have been told that he is talking about me in that he is telling other officers that I am a paper dropper and that I should have been transferred instead of him.

(Doc. 35-1 at 33). In this charge, Plaintiff checked boxes indicating that he believed he had been subjected to discrimination based on sex, national origin, and retaliation. (*Id.*). Further, Plaintiff's charge lists "09-25-14" as the latest date on which discrimination took place, and the "continuing action" box is not checked. (*Id.*).

Defendant contends that Plaintiff failed to exhaust his EEOC administrative remedies as to all claims except those based on the alleged harassment by Deem. (Doc. 36 at 3–6; *see also* Doc. 44 at 3("There is no dispute that Plaintiff exhausted his administrative remedies with respect to the alleged harassment by Deem in September 2014. . . . There is

- 14 -

also no dispute that Plaintiff exhausted his administrative remedies with respect to allegations of later harassment by Deem.")). Specifically, Defendant argues that Plaintiff did not exhaust the following claims because they were not included in his EEOC charge and are not "like or reasonably related to" the allegations in the EEOC charge: 1) his claim of constructive discharge; 2) his claim that he was physically and verbally harassed by Sgt. Barreras, a supervisor; 3) his claim that he was harassed by Deputy Warden Hibbard; and 4) his claim that ADC failed to promote him to a full-time position on the fire crew in retaliation for filing complaints of discrimination. (Doc. 36 at 5–6; Doc. 44 at 3). The Court will address each of these claims in turn.

### 1. Constructive Discharge Claim

Defendant first contends that Plaintiff failed to exhaust his administrative remedies as to his constructive discharge claim. (Doc. 36 at 5). The Court agrees.

Plaintiff's EEOC charge alleged that Deem subjected him to a hostile work environment by making various harassing comments based on Plaintiff's sex and national origin, and that Deem retaliated against Plaintiff for filing an internal EEO complaint. (Doc. 35-1 at 33). Plaintiff's charge did not allege constructive discharge, (*id.*), and Plaintiff avers in his Complaint, for the first time, that the discriminatory harassment he suffered at the hands of his co-workers and supervisors "ultimately forced [him] to resign his employment with ADOC[.]" (Doc. 1 ¶¶ 23, 26).

At issue, then, is whether Plaintiff's constructive discharge claim is "like or reasonably related to" the allegations contained in his EEOC charge. *Green*, 883 F.2d at 1476. Defendant contends that it is not, pointing out that Plaintiff "resigned after the EEOC had concluded its investigation of Plaintiff's charge[]," and that "Plaintiff's alleged constructive discharge was not raised in the administrative process or investigated by the EEOC." (Doc. 36 at 5). In his Response, Plaintiff does not discuss whether he exhausted his constructive discharge claim in particular; rather, Plaintiff asserts that his EEOC charge was sufficient to exhaust his administrative remedies as to each of his claims because "it 'can reasonably be expected' that the EEOC would also investigate any alleged

discriminatory acts suffered by Mr. Villa subsequent to the filing of his charge" after Plaintiff complained of the hostile work environment at ADC. (Doc. 43 at 8). However, the Court cannot agree that a reasonable EEOC investigation growing out of Plaintiff's charge would have encompassed the constructive discharge claim here. *B.K.B.*, 276 F.3d at 1100; *Green*, 883 F.2d at 1476.

"[C]onstructive discharge is a claim distinct from the underlying discriminatory act." *Green v. Brennan*, 136 S. Ct. 1769, 1779 (2016) (citing *Pennsylvania State Police v. Suders*, 542 U.S. 129, 149 (2004) (holding that a hostile-work environment claim is a "lesser included component" of the "graver claim of hostile-environment constructive discharge")). Therefore, constructive discharge "does not grow out of harassment allegations." *E.E.O.C. v. California Psychiatric Transitions, Inc.*, 644 F. Supp. 2d 1249, 1270 (E.D. Cal. 2009) (quoting *Harvill v. Westward Commc'ns, LLC*, 311 F. Supp. 2d 573, 585 (E.D. Tex. 2004)).[9] As explained in *California Psychiatric Transitions, Inc.*:

> Without more, allegations of sexual harassment do not provide a foundation for constructive discharge claims. Constructive discharge ends the employer/employee relationship and requires the plaintiff to demonstrate that 'a reasonable person in the plaintiff's position would have felt he or she was forced to quit because of intolerable or discriminatory work conditions.' *Wallace v. City of San Diego*, 479 F.3d 616, 626 (9th Cir. 2007). This differs dramatically from sexual harassment's posture and required elements.

*California Psychiatric Transitions, Inc.*, 644 F. Supp. 2d at 1270 (holding that the EEOC was precluded from pursuing a Title VII constructive discharge claim on behalf of a female employee against her former employer because the employee did not include the claim in

---

[9] In *Harvill v. Westward Communications, LLC*, the district court held that the plaintiff failed to exhaust administrative remedies as to her Title VII constructive discharge claim alleging that she was forced to quit due to harassment at the hands of her coworker because this claim was beyond the scope of the plaintiff's EEOC charge, which "only contain[ed] harassment allegations regarding the terms and conditions of [plaintiff's] employment." *Harvill*, 311 F. Supp. 2d at 585 (citing *Winegarner v. Dallas Cty. Sch.*, No. CIV.A. 3:98-CV-2523-L, 1999 WL 325028, at *2 (N.D. Tex. May 19, 1999) (holding that treatment on the job and constructive discharge are separate and distinct discriminatory events; thus, constructive discharge claim was beyond the scope of the charge)).

her EEOC charge and because the EEOC's investigation into the employee's hostile work environment charge was insufficient to put the employer on notice of the constructive discharge claim).

As in *California Psychiatric Transitions, Inc.* and *Harvill*, Plaintiff's constructive discharge claim was beyond the scope of his EEOC charge, which only contained retaliation allegations and harassment allegations regarding the terms and conditions of his employment. *California Psychiatric Transitions, Inc.*, 644 F. Supp. 2d at 1270; *Harvill*, 311 F. Supp. 2d at 585. Plaintiff's EEOC charge is directed solely at conduct which took place while he was still working, and an investigation into this conduct would not have encompassed his subsequent claim that he was constructively discharged. *See Green*, 883 F.2d at 1476. Indeed, the allegations in Plaintiff's EEOC charge in no way express that Plaintiff believed his working conditions were so difficult that he felt compelled to resign. In analogous circumstances, cases within the Ninth Circuit have held that constructive discharge claims cannot grow out of the exhausted claims in the EEOC complaint. *See Decampo v. OS Rest. Servs., LLC*, No. CIV. 14-00092 ACK, 2014 WL 1691628, at *5 (D. Haw. Apr. 29, 2014) (concluding that plaintiff's EEOC charge, which failed "to even hint at any discriminatory circumstances surrounding [her] departure" from defendant's employ, did not encompass plaintiff's claim of constructive discharge); *Nganje v. CVS RX Servs., Inc.*, No. 2:13-CV-2327-HRH, 2014 WL 545354, at *3 (D. Ariz. Feb. 11, 2014) (plaintiff failed to exhaust administrative remedies as to her constructive discharge claim where her EEOC charge contained no factual allegations discussing constructive discharge and where the circumstances surrounding the alleged constructive discharge were not reasonably related to the allegations in plaintiff's EEOC charge pertaining to hostile work environment).[10]

_____

[10] *See also Garcia v. PSI Envtl. Sys.*, No. 1:10-CV-0055-EJL, 2012 WL 914829, at *4–5 (D. Idaho Mar. 16, 2012) (concluding that the plaintiff failed to exhaust his administrative remedies as to his Title VII constructive discharge claim because he didn't expressly claim constructive discharge in his EEOC filings—which only alleged discrimination based on national origin—and because the factual allegations in his charge were not reasonably related to a claim for constructive discharge); *McComber v. Potter*, No. 06-5089 FDB, 2006 WL 2380686, at *3 (W.D. Wash. Aug. 16, 2006) (plaintiff failed to exhaust constructive discharge claim where that claim was not reasonably related to her

Further, Plaintiff's constructive discharge claim was not "like or reasonably related" to the charges alleged in his EEOC complaint because it relies on a different theory of liability and different events which were temporally remote from the facts giving rise to the claims in his EEOC complaint. *See Newbold-Reese v. Shinseki*, No. CV 10-1176-GW(PJWX), 2010 WL 11549569, at *4 (C.D. Cal. June 28, 2010).[11] Plaintiff's resignation in September 2017 occurred at least nine months *after* Deem was fired, (Doc. 35-1 at 77 (stating that ADC terminated Deem's employment in 2016)), and more than two years *after* the alleged harassing and retaliatory conduct by Deem which formed the basis of his EEOC charge.[12] In similar situations, courts within this circuit have held that the EEOC's investigation could not have reasonably encompassed the alleged constructive discharge. *See Hellman v. Weisberg*, No. CV-06-1465-PHX-FJM, 2007 WL 505308, at *2 (D. Ariz. Feb. 14, 2007) (plaintiff failed to exhaust her administrative remedies as to her constructive discharge claim because plaintiff's EEOC charge did not encompass a constructive discharge claim where the charge only claimed retaliation for engaging in protected activity and plaintiff did not resign until eight months after filing the charge); *Jones v. Gates Corp.*, No. C98-73 MJM, 1999 WL 33656873, at *10 (N.D. Iowa Aug. 26, 1999) (plaintiff failed to exhaust administrative remedies on his constructive discharge claim where plaintiff's EEOC complaint—which was filed over one month before he announced his decision to retire—"never alleged anything to the effect that his working conditions were so difficult that a reasonable person in his position would have felt compelled to resign," where plaintiff never sought to amend his complaint, and where defendant "was not given an

claims alleging retaliation and discrimination on the basis of age and sex in her EEOC complaints).

[11] In *Newbold-Reese v. Shinseki*, the court noted that even if the plaintiff had submitted evidence demonstrating that her claim for constructive discharge was within the scope of the investigation arising from her EEOC complaint, the court would have still had to find that her constructive discharge claim was not "reasonably related" to the retaliation claim alleged in her EEOC complaint because her constructive discharge claim was based on a different theory of liability and different events which were temporally remote from the facts giving rise to the retaliation claim alleged in her EEOC complaint. *Newbold-Reese*, 2010 WL 11549569, at *4.

[12] At his deposition, Plaintiff even testified that, at the time he resigned, he had not seen Deem for at last a year. (*See* Doc. 42-3 at 11, Plaintiff Depo., p. 123, l. 2–19).

opportunity to conciliate the allegations of constructive discharge"); *Mills v. Babbitt*, No. C 93-04387 CW, 1995 WL 638795, at *6 (N.D. Cal. Oct. 19, 1995), *aff'd*, 152 F.3d 927 (9th Cir. 1998) (granting defendant's motion for summary judgment on the ground that plaintiff's constructive discharge claim was procedurally barred because there was "no indication that the administrative investigation should have encompassed the alleged constructive discharge, inasmuch as [p]laintiff did not decide to resign until two years after he filed the complaint, and nearly one year after the investigation of his charge").

As Defendant points out, Plaintiff "could not have told the EEOC investigator about his alleged constructive discharge because the EEOC had completed its investigation and closed its file two months before he decided to quit." (Doc. 44 at 4). Thus, Plaintiff's resignation could not have been the subject of the EEOC investigation unless Plaintiff amended his EEOC charge or filed a new charge on this basis (which he did not). Furthermore, Plaintiff does not present any evidence indicating that the EEOC or his employer was on notice of the constructive discharge claim prior to this suit. For these reasons, Plaintiff did not exhaust his constructive discharge claim. *See Ong*, 642 F.2d at 320 (dismissing unexhausted constructive discharge claim because it was not "like or reasonably related" to the discrimination in promotion allegations in the charge and because the EEOC was not given the opportunity to consider the constructive discharge issue before the initiation of the suit, thereby "subvert[ing] the procedures and policies of Title VII and justif[ying] precluding its presentation in federal court"); *Diefenderfer v. Peters*, No. C08-958Z, 2009 WL 1884419, at *3 (W.D. Wash. June 29, 2009) (rejecting plaintiff's argument that her constructive discharge claim—which she raised for the first time 6 years after her resignation—was "like or reasonably related" to the charges outlined in her EEOC complaints because: the constructive discharge claim presented a different theory of liability not presented by the charges in her EEOC claims; plaintiff's resignation was not the subject of the EEOC investigation; and plaintiff never filed a new EEOC complaint nor amended one of her existing EEOC complaints to allege constructive

discharge).[13]

Even construing Plaintiff's EEOC charge liberally, it is clear that Plaintiff did not exhaust his administrative remedies as to his claim of constructive discharge as this claim presents a new theory of discrimination which has not been investigated by the EEOC and which the previous investigation would not have encompassed. Accordingly, the Court grants summary judgment to Defendant on Plaintiff's constructive discharge claim.

### 2. Claim Alleging Harassment by Sgt. Barreras

Plaintiff alleges that Sgt. Barreras, the fire crew supervisor, physically and verbally harassed him and inmates during fire crew training exercises in October 2015. (Doc. 43 at 13; DSOF ¶ 72; PSOF ¶¶ 72, 141–42). Defendant, however, argues that Plaintiff failed to exhaust his claim that he was discriminatorily harassed by Barreras because there is no reference to any of these allegations in Plaintiff's EEOC charge, and because this claim was not investigated by the EEOC. (Doc. 36 at 5–6; Doc. 44 at 3). Further, Defendant claims that Plaintiff's harassment claim against Barreras is not "like or reasonably related to" the allegations of harassing and retaliatory conduct by Deem which Plaintiff set forth in his EEOC complaint. (Doc. 36 at 6 ("The allegation that a fire crew supervisor was inappropriately touching inmates or plaintiff with a walking stick during training activities in late 2015 is not like or related to the verbal harassment alleged in the EEOC charge.")).

In his Response, Plaintiff contends that his harassment claims against Barreras are

[13] *See also Vinson v. Nielsen*, No. 16CV2518, 2018 WL 5617733, at *1–2, *4 (S.D. Cal. Oct. 29, 2018) (plaintiff failed to exhaust her Title VII constructive discharge claim that occurred after her previous administrative filings alleging discrimination based on sex and retaliation, "however related to the allegations in those filings," because plaintiff did not seek administrative remedies on the constructive discharge claim within the limitations period); *Equal Employment Opportunity Comm'n v. Swissport Fueling, Inc.*, 916 F. Supp. 2d 1005, 1026 (D. Ariz. 2013) (granting summary judgment to employer on former employee's constructive discharge claim where employee's initial charge with the EEOC and the EEOC's letter of determination both failed to mention the constructive discharge claim and employee presented no evidence that employer was on notice of the constructive discharge claim); *Tupua v. Hawaii, Dep't of Health*, No. CV. 08-00350DAELEK, 2009 WL 1561578, at *10–11 (D. Haw. June 3, 2009) (plaintiff failed to exhaust administrative remedies as to Title VII constructive discharge claim where he provided no evidence that he presented the EEOC with the list of incidents set forth in his complaint that he asserted were the basis for his constructive discharge claim and where plaintiff filed the EEOC charge prior to his retirement but presented no evidence that he attempted to amend his charge to include the constructive discharge claim or file a new charge based on that theory).

nevertheless exhausted because they are part of a pattern of harassment that Plaintiff suffered at ADC after filing his EEOC charge which was "virtually identical in content and context to the harassment specified in the EEOC charge." (Doc. 49 at 8).[14] The Court disagrees. Rather, as Defendant points out, the allegations against Barreras "refer to discrete acts that are markedly different from the allegations in the EEOC charge—the basis (physical assault) is different; the date of the harassment (October 2015) is nearly a year after Plaintiff complained about Deem; the alleged perpetrator (Barreras, a supervisor) is different; [and] the location (fire house) is different." (Doc. 44 at 3). Indeed, the allegations against Barreras are so different that any investigation as to the allegations against Deem would not have encompassed them. As "the two claims are not so closely related that a second administrative investigation would be redundant, the EEOC must be allowed to investigate the dispute before [Plaintiff] may bring a Title VII suit." *Stache*, 852 F.2d at 1234 (citing *Brown*, 732 F.2d at 730).

While it is true that "Title VII charges can be brought against persons not named in an E.E.O.C. complaint as long as they were involved in the acts giving rise to the E.E.O.C. claims," *Wrighten v. Metropolitan Hosp.*, 726 F.2d 1346, 1352 (9th Cir. 1984), there is no indication that Barreras participated in the acts leading up to the administrative charge filed with the EEOC by Plaintiff. Rather, as in *Bratton v. Bethlehem Steel Corp.*, Plaintiff's EEOC charge neither names Barreras nor alleges facts from which it could be inferred that Barreras violated Title VII, thus barring a Title VII action against him here. *Bratton v. Bethlehem Steel Corp.*, 649 F.2d 658, 666 (9th Cir. 1980) (failure to name defendant in EEOC charge barred subsequent Title VII action against that defendant where

---

[14] In arguing that Plaintiff did not have to file additional EEOC charges to "reflect the series of additional discriminatory and retaliatory acts that he suffered at ADOC subsequent to the filing of his EEOC charge," (Doc. 43 at 10), Plaintiff relies on *Anderson v. Reno*, 190 F.3d 930 (9th Cir. 1999), which has since been abrogated by *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 107 (2002). Although Plaintiff cites *Anderson* for the proposition that requiring him to file EEOC charges addressing each of his later claims "would erect a needless procedural barrier," 190 F.3d at 938, it remains that the later incidents must be "like or reasonably related to" the allegations of the EEOC charge. *See Doe v. State of Arizona*, No. CV-15-02399-PHX-DGC, 2016 WL 1089743, at *3 (D. Ariz. Mar. 21, 2016). However, Plaintiff is unable to make this requisite showing as to his claims alleging harassment by Barreras and Hibbard, constructive discharge, and failure to promote.

administrative charge did not allege facts from which it could be inferred that defendant violated Title VII).

Although a court may also have jurisdiction over defendants not named in the EEOC charge where the EEOC or the defendants themselves "should have anticipated" that the claimant would name those defendant in a Title VII suit, *Sosa*, 920 F.2d at 1459 (citing *Chung*, 667 F.2d at 792), both Barreras and the EEOC could not have anticipated that Plaintiff might name Barreras in the case at bar. Rather, Plaintiff filed his EEOC charge in March 2015, (Doc. 35-1 at 33), but the alleged physical and verbal harassment by Barreras did not even occur until October 2015, (DSOF ¶ 72; PSOF ¶ 72). *See Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 645–46 (9th Cir. 2003) (plaintiff failed to exhaust administrative remedies for his claim of retaliation for filing an EEOC charge because the alleged retaliation was committed by individuals not identified as perpetrators in the EEOC charge and "did not occur within the time frame of the events alleged in the EEOC charge"). As Plaintiff neither named Barreras in his EEOC charge nor alleged any facts implying that Barreras discriminated, a Title VII action against Barreras "is premature at best." *Stache*, 852 F.2d at 1234 (citing *Bratton*, 649 F.2d at 666). As Plaintiff failed to exhaust his administrative remedies as to his claim alleging harassment by Barreras, the Court grants summary judgment to Defendant on this claim.

### 3.     Claim Alleging Harassment by Hibbard

Plaintiff avers that Deputy Warden Hibbard made various harassing comments based upon Plaintiff's status as a Mexican-American from December 2015 through January 2016. (PSOF ¶¶ 156–61). As with Plaintiff's claim against Barreras, Defendant argues that Plaintiff failed to exhaust his claim that he was discriminatorily harassed by Hibbard because there is no reference to any of these allegations in Plaintiff's EEOC charge and because this claim was not investigated by the EEOC. (Doc. 36 at 5–6; Doc. 44 at 3). Further, Defendant claims that the allegations against Hibbard "refer to discrete acts with different dates (December 2015–January 2016) and a different perpetrator (supervisor Hibbard rather than co-worker Deem)." (Doc. 44 at 3). Accordingly, Defendant contends

that an EEOC investigation of the Hibbard allegations would not have been redundant of the investigations of the allegations concerning Deem. (*Id.*). The Court agrees, as Plaintiff's claim regarding Hibbard is not "like or reasonably related to" the allegations set forth in Plaintiff's EEOC charge resulting from Deem's allegedly discriminatory and retaliatory conduct. *Green*, 883 F.2d at 1476.

Although Plaintiff characterizes his claim against Hibbard as part of a "series of additional discriminatory and retaliatory acts that he suffered at ADC subsequent to the filing of his EEOC charge," (Doc. 43 at 10), these allegations against Hibbard do not constitute "component acts" of the claims in his EEOC charge discussing Deem's discriminatory and retaliatory conduct. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). Rather, the allegations against Hibbard refer to discrete acts that are markedly different from the allegations in Plaintiff's EEOC charge. Not only is there no indication that Hibbard participated in the acts leading up to the EEOC charge, *Wrighten*, 726 F.2d at 1352, but no facts were alleged in that administrative charge from which it could be inferred that Hibbard violated Title VII, *Bratton*, 649 F.2d at 666; *Stache*, 852 F.2d at 1234.

Similarly, there is no way that Hibbard or the EEOC "should have anticipated" that Plaintiff would name Hibbard as a defendant in this suit, *Sosa*, 920 F.2d at 1459 (citing *Chung*, 667 F.2d at 792), as the harassment by Hibbard did not even occur until December 2015—more than eight months after Plaintiff filed his EEOC charge. Thus, as to Hibbard, Plaintiff's EEOC charge does not "describe the facts and legal theory with sufficient clarity to notify the agency that employment discrimination is claimed." *Cooper v. Bell*, 628 F.2d 1208, 1211 (9th Cir. 1980). The claims alleged in Plaintiff's EEOC charge simply do not encompass his claims against Hibbard. To permit Plaintiff to pursue this cause of action against Hibbard now would undermine the vital policy interests embedded in Title VII aiming to resolve disputes and eliminate unlawful employment practices by conciliation. *Ong*, 642 F.2d at 320.

For these reasons, the Court finds that Plaintiff failed to exhaust his administrative

remedies as to his claim alleging harassment by Hibbard. As the Court cannot consider allegations beyond the scope of the EEOC charge, *Albano v. Schering-Plough Corp.*, 912 F.2d 384, 386 (9th Cir. 1990), the Court grants summary judgment to Defendant on this claim.

### 4. Failure to Promote Based on Retaliation

Plaintiff also contends that ADC failed to promote him to a full-time position on the fire crew in retaliation for filing complaints of discrimination. (Doc. 43 at 17 ("After Mr. Villa filed his internal complaints of discrimination with ADC, his co-workers and supervisors retaliated against him by . . . denying him a full-time position on the fire crew because he was a 'paper dropper.'"); PSOF ¶¶ 151–52). Although unclear from his Response and supporting statement of facts, Plaintiff's deposition testimony specifies that he believed ADC failed to promote him based on the complaints he filed regarding Deem's conduct. (*See* Doc. 42-3 at 6, Plaintiff Depo., p. 102, l. 3–5 ("I felt that it was retaliation for reporting what would happen to Deem.")).[15]

Defendant argues that Plaintiff failed to exhaust this failure to promote claim because the "allegation that he was denied a full-time position on the fire crew was not included in his EEOC charge" and is "entirely different from the allegations in the EEOC charge because it involved an alleged adverse action rather than harassment." (Doc. 44 at 3–4). Specifically, the claim that ADC failed to promote him is "temporally remote and involves perpetrators other than Deem." (*Id.* at 4). The Court agrees with Defendant that Plaintiff's failure to promote claim is not "like or reasonably related" to the discriminatory

---

[15] Plaintiff alleges that Sgt. Hilnojosa and the fire training supervisor, Jake, told Plaintiff that he was not selected for a full-time position on the fire crew because he had filed complaints of discrimination and was labeled a "paper dropper." (PSOF ¶¶ 151–52). When asked whether he knew if Sergeant Hilnojosa "had any awareness of these particular complaints marked as Exhibits 2, 3, and 6"— referring to the EEOC charge, the September 25, 2014 internal complaint about Deem, and the March 30, 2015 internal complaint about Deem–Plaintiff responded: "To the best of my knowledge, I believe he was referring to that." (Doc. 42-3 at 6, Plaintiff Depo., p. 103, l. 18–22; *see also* Doc. 42-2 at 2, Plaintiff Depo., p. 2 (indicating that Plaintiff's March 13, 2015 EEOC charge was marked as Exhibit 2, Plaintiff's September 25, 2014 internal complaint was marked as Exhibit 3, and Plaintiff's March 30, 2015 internal complaint was marked at Exhibit 6)). Plaintiff also testified that he had been called a "snitch" and a rat" because he had "ratted out Deem." (Doc. 42-4 at 7, Plaintiff Depo., p. 196, l. 16–p. 197 l. 6).

and retaliatory conduct by Deem set forth in Plaintiff's EEOC charge, and would not fall within the scope of an EEOC investigation that could reasonably be expected to grow out of this charge. *Green*, 883 F.2d at 1476; *B.K.B.*, 276 F.3d at 1100. The only person accused of discriminatory acts in Plaintiff's EEOC charge was Deem, who was not the supervisor responsible for the fire crew's hiring decisions, or even a supervisor at all. (*See* Doc. 42-3 at 6, Plaintiff Depo., at p. 101, l. 1–3 ("Jake is the guy that oversees in hiring fire crew.")). Based on Plaintiff's EEOC charge, the EEOC would have had no reason to investigate any of the supervisors in charge of the hiring decisions of the fire crew. In fact, the EEOC charge does not even mention the fire crew.

In response, Plaintiff seeks to excuse his failure to exhaust this claim by insisting that he went back to the EEOC to file an additional charge of discrimination alleging that ADC failed to promote him in retaliation for his complaints of discrimination, but was told that it was unnecessary based upon his first EEOC charge. (Docs. 43 at 9; 42-3 at 5, Plaintiff Depo., p. 98, l. 4–10 (when asked whether he ever filed an amended EEOC complaint, Plaintiff responded: "I went back to try to open up one for the situation with the fire crew, but they told me that since the retaliation box was there, that that would be included technically.")).

Under Ninth Circuit precedent, a court may equitably excuse a plaintiff's failure to exhaust administrative remedies where that failure was "due to agency negligence." *B.K.B.*, 276 F.3d at 1101–02; *Albano*, 912 F.2d at 387.[16] "The equities favor a discrimination plaintiff who (1) diligently pursued his claim; (2) was misinformed or misled by the administrative agency responsible for processing his charge; (3) relied in fact on the misinformation or misrepresentations of that agency, causing him to fail to exhaust his administrative remedies; and (4) was acting pro se at the time." *Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir. 2001). Unlike the plaintiffs in *Rodriguez*, *B.K.B.*, and

---

[16] For example, in *Albano v. Schering-Plough Corp.*, the Ninth Circuit excused a plaintiff from failing to charge constructive discharge along with his charge of failure to promote on the ground of age, because the EEOC had refused to make the amendment and had told the plaintiff incorrectly that constructive discharge would be encompassed by his original charge. *Albano*, 912 F.2d at 387–88.

*Albano*, however, Plaintiff has not proffered any evidence of how he diligently pursued his failure to promote based on retaliation claim. In *Rodriguez*, the plaintiff submitted a declaration setting forth the facts of his interview with the agency "with great specificity" which qualified him under these factors. *Rodriguez*, 265 F.3d at 902. In *B.K.B.*, the plaintiff submitted an affidavit from an agency official suggesting that the failure to exhaust administrative remedies was not the plaintiff's fault, in addition to presenting her pre-complaint questionnaire as evidence that her claim was properly exhausted. *See B.K.B.*, 276 F.3d at 1102–03. In *Albano*, the plaintiff submitted a "detailed declaration" describing how he had spoken with the EEOC fourteen times, how the EEOC had assured the plaintiff at least three times that the EEOC charge encompassed the disputed claim, and how the EEOC had refused his efforts to amend the EEOC charge. *See Albano*, 912 F.2d at 387–88.

In contrast, here, Plaintiff's allegation that the EEOC improperly failed to amend his EEOC charge is not set forth in a detailed, sworn declaration. Further, Plaintiff has not presented the Court with any significant evidence that the EEOC assured him that the failure to promote claim was encompassed in the original EEOC charge, as was the case in *Albano*. Rather, Plaintiff only cites portions of his deposition testimony where he states that he went back to the EEOC to file an additional charge of discrimination alleging that ADC failed to promote him based on his complaints of discrimination, but was told that it was unnecessary based upon his first EEOC charge. (Docs. 43 at 9; 42-3 at 5, Plaintiff Depo., p. 98, l. 4–10). Not only is Plaintiff's statement alleging that he attempted to amend his EEOC charge inconsistent with his deposition testimony,[17] but this statement does not,

---

[17] Plaintiff alleges in his Statement of Facts that he went back to the EEOC to file another Charge of Discrimination based on Sgt. Hilnojosa and "Jake's" comments that he was denied a full-time position on the fire crew because of his complaints of discrimination, but was told by EEOC investigator "Jose Effio" that "filing a new EEOC Charge was unnecessary based on the scope of his original charge." (PSOF ¶¶ 151–54). In support of this statement, Plaintiff cites his deposition testimony at page 97, line 25, through page 100, line 17, as well as lines 5 through 14 on page 124. (PSOF ¶ 154). However, these portions of Plaintiff's deposition testimony nowhere mention an EEOC investigator by the name of "Jose Effio." (*See* Docs. 42-3 at 5, Plaintiff Depo., at p. 97, l. 25–p. 100, l. 17; 42-3 at 11, Plaintiff Depo., at p. 124, l. 5–14). In fact, the deposition testimony which Plaintiff cites refers to *another* EEOC employee by the name of "Mark Effie" who Plaintiff claims he contacted and told that he "felt that [he] was being retaliated against." (Doc. 42-3 at 11,

by itself, demonstrate that Plaintiff *diligently* pursued this failure to promote claim but was prevented from doing so by an error on the part of the agency. *See Warzecha v. Kemper Sports Mgmt. Inc.*, No. 6:11-CV-06221-SI, 2012 WL 2396888, at *6 (D. Or. June 25, 2012) (declining to equitably excuse the plaintiff's failure to exhaust administrative remedies for his disability harassment claim on the grounds that the plaintiff did not proffer evidence of how he diligently pursued this claim or how the agency was negligent in omitting references to his disability in his complaint where the plaintiff only submitted the original draft of his complaint without further explanation and a declaration stating that he notified the agency that he was discriminated against based on his disability but did "not know why that claim was not included in the final complaint").[18] "One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence." *Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984). Based on this record, the Court declines to exercise its equitable powers to excuse Plaintiff's failure to exhaust administrative remedies for his failure to promote based on retaliation claim. The Court, therefore, grants summary judgment to Defendant on Plaintiff's claim that ADC failed to promote him to a full-time position on the fire crew in retaliation for filing complaints of discrimination.

---

Plaintiff Depo., at p. 124, l. 5–14). Plaintiff states in this portion of his deposition that Mark Effie then responded: "don't worry, the box for retaliation's already checked." (*Id.*). Accordingly, it is unclear to the Court why Plaintiff avers in his Response and Statement of Facts that Jose Effio was responsible for improperly telling him that his EEOC charge already encompassed his failure to promote claim, (Doc. 43 at 9; PSOF ¶ 154), where the deposition testimony upon which these allegations rely mentions an entirely different individual, (Doc. 42-3 at 11, Plaintiff Depo., at p. 124, l. 5–14).

[18] *See also Frederickson v. United Parcel Serv.*, No. C-97-3644 VRW, 1999 WL 129534, at *3 (N.D. Cal. Mar. 8, 1999) (declining to equitably excuse the plaintiff's failure to exhaust administrative remedies as to her complaints of sex discrimination and sexual harassment where the plaintiff alleged that she relayed these complaints to the EEOC officer but was allegedly told by the officer that her charge was enough to get a right to sue letter without these claims, because there was no indication that the plaintiff repeatedly attempted to explain her charge to the EEOC, specifically requested that the charge be amended, or that the EEOC ever refused any direct request by the plaintiff); *Carter v. City & Cty. of San Francisco*, No. C 94-4246 FMS, 1996 WL 346887, at *8 (N.D. Cal. June 19, 1996), *aff'd*, 125 F.3d 857 (9th Cir. 1997) (declining to equitably excuse the plaintiff's failure to exhaust his harassment or hostile work environment claims where the plaintiff failed to present any significant evidence that the EEOC assured him that these claims were encompassed in the original EEOC charge or that the EEOC investigator prevented plaintiff from including these claims, and where there was no indication that the EEOC investigative file was unavailable).

**B.** **Plaintiff's Title VII Hostile Work Environment Claims Resulting from Deem's Conduct**

As there is no dispute that Plaintiff exhausted his administrative remedies as to his claims based on the alleged harassment by Deem, (Docs. 36 at 6; 44 at 3), the Court now turns to the merits. At issue is whether Plaintiff presented sufficient evidence to demonstrate a prima facie case of hostile work environment due to harassment based on sex, retaliation, and national origin.

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e–2(a)(1). Title VII's general prohibition against discrimination extends to harassment claims. *Faragher*, 524 U.S. at 786; *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003); *Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1527 (9th Cir. 1995). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted).

To prevail on his hostile environment claims based on sex and national origin, Plaintiff must establish a "pattern of ongoing and persistent harassment severe enough to alter the conditions of employment." *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1108 (9th Cir. 1998). To satisfy this requirement, Plaintiff must show that: (1) he was subjected to verbal or physical conduct based on his membership in a protected class; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *E.E.O.C. v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 997 (9th Cir. 2010).

In order to be actionable under Title VII, the work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or

abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787 (citing *Harris*, 510 U.S. at 21–22). "In analyzing whether the alleged conduct created an objectively hostile work environment, we must assess all the circumstances, 'including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1034 (9th Cir. 2005) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71 (2001)). "[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (internal citation omitted). Further, "[w]hether the workplace is objectively hostile must be determined from the perspective of a reasonable person with the same fundamental characteristics." *Fuller*, 47 F.3d at 1527.

### 1. Harassment Based on Sex

Under Title VII, sexual harassment in the form of a hostile work environment constitutes actionable sex discrimination. *Meritor Sav. Bank, FSB*, 477 U.S. at 64. In *Oncale v. Sundowner Offshore Services, Inc.*, the Supreme Court extended Title VII's protections to male-on-male sexual harassment. 523 U.S. 75, 79–80 (1998) ("Title VII prohibits 'discriminat[ion] . . . because of . . . sex' in the 'terms' or 'conditions' of employment. Our holding that this includes sexual harassment must extend to sexual harassment of any kind that meets the statutory requirements."). Thus, same-sex sexual harassment is actionable under Title VII. *Id.*

"Sexual or gender-based conduct which is abusive, humiliating, or threatening violates Title VII even if it does not cause diagnosed psychological injury to the victim." *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994) (citing *Harris*, 510 U.S. at 22). "It is enough, rather, if such hostile conduct pollutes the victim's workplace, making it more difficult for [him] to do [his] job, to take pride in [his] work, and to desire

to stay on in [his] position." *Id.*

"[N]ot all workplace conduct that may be described as harassment affects a term, condition, or privilege of employment within the meaning of Title VII." *Brooks v. City of San Mateo*, 229 F.3d 917, 927 (9th Cir. 2000). Rather, "harassment is actionable under Title VII to the extent it occurs 'because of' the plaintiff's sex." *Nichols v. Azteca Rest. Enterprises, Inc.*, 256 F.3d 864, 872 (9th Cir. 2001) (citing *Oncale*, 523 U.S. at 79).

In *Oncale*, the Supreme Court set forth several ways in which a plaintiff can make a showing of same-sex harassment. 523 U.S. at 80–81. In addition to offering evidence that the harasser was motivated by sexual desire toward members of his own gender, a plaintiff can offer proof of gender-specific statements from which an inference can be drawn that "the harasser is motivated by general hostility to the presence of members of the same sex in the workplace." *Id.* at 80. Further, a plaintiff can offer direct, comparative evidence showing differences in how the harasser treats members of both sexes in the workplace. *Id.* at 81. In addition to using one of these methods set forth in *Oncale*, a plaintiff can prove same-sex sexual harassment by establishing that the harassment was based upon perceived non-conformance with gender-based stereotypes. *Nichols*, 256 F.3d at 874–75 (finding that harassment of the plaintiff occurred because of his sex inasmuch as verbal abuse reflected belief that plaintiff did not act as a man should act where plaintiff presented evidence of sexual stereotyping, including his co-workers' verbal abuse of him because of his feminine mannerisms and references to him as "she" and "her").[19]

Defendant contends that Plaintiff failed to set forth any evidence supporting any of these theories, as there is no evidence suggesting that the alleged harassment Plaintiff suffered was motivated by sexual desire, by hostility to the presence of males in the workplace, or by perceived non-conformance with male stereotypes. (Doc. 36 at 9). In support, Defendant points to Plaintiff's deposition testimony stating that he had no reason

---

[19] In *Nichols*, the Ninth Circuit held that the holding in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)—that a woman who was denied a partnership in an accounting firm because she did not match a sex stereotype had an actionable claim under Title VII— "applies with equal force to a man who is discriminated against for acting too feminine." *Nichols*, 256 F.3d at 874.

to believe that Deem was sexually or physically attracted to him, and that he thought it was sex discrimination for Deem to refer to him as a homosexual because Plaintiff is straight and Deem was calling him the opposite of straight. (*Id.* (citing (DSOF ¶¶ 33–36; PSOF ¶¶ 33–36)). Thus, while offensive, Defendant argues that Deem's alleged comments are not harassment "because of" sex. (*Id.*).

Citing *Nichols*, Plaintiff asserts that the verbal abuse he allegedly suffered at Deem's hands occurred "because of sex" because Plaintiff did not conform to Deem's "stereotype of a 'macho man'" and was consequently labeled as a "fag" and a "homo." (Doc. 43 at 13). Nevertheless, *Nichols* is distinguishable. In *Nichols*, the male plaintiff presented evidence that he was frequently referred to by male co-workers and a male supervisor as "she" and "her" in addition to being mocked for walking and carrying his serving tray "like a woman." *Nichols*, 256 F.3d at 870. The Ninth Circuit found that "the systemic abuse directed at Sanchez reflected a belief that Sanchez did not act as a man should act" because he had feminine mannerisms. *Id.* at 874. There, Sanchez' co-workers and supervisors "repeatedly reminded Sanchez that he did not conform to their gender-based stereotypes by verbally abusing him with derogatory insults which were "closely linked to gender." *Id.*

In contrast, here, Plaintiff presents no evidence that Deem believed he was effeminate or failed to conform to gender stereotypes. (*See* Docs. 42–43). He does not provide any evidence concerning what male stereotypes he failed to meet, and does not cite any particular comments, actions, or other proof demonstrating that Deem believed he behaved inappropriately for a man. Merely asserting a sex-stereotyping theory in his Response, without any factual support, is insufficient to create a genuine dispute of material fact as to whether the harassment occurred "because of sex." *See Liberty Lobby, Inc.*, 477 U.S. at 247–48 (The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment); *see also First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968) (noting that the party asserting the existence of an issue of material fact at summary judgment must present "sufficient evidence supporting the claimed factual dispute" and stating that "a party cannot

rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him.").

Moreover, as Defendant points out, Plaintiff's own deposition testimony suggests that he does not believe he was being verbally harassed for appearing non-masculine or for otherwise not fitting the male stereotype, but, rather, believed it was discriminatory for Deem to call him a "homo" and a "faggot" *because* Plaintiff is straight. (DSOF ¶¶ 33–36; PSOF ¶¶ 33–36). Even construing the evidence in the light most favorable to Plaintiff and assuming Deem repeatedly called Plaintiff a "faggot," "fag," "homo," or "gay," the Court is unable to conclude that this alone establishes that Plaintiff was discriminated against based on his sex.

As the Supreme Court stated in *Oncale*: "We have never held that workplace harassment . . . is automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale*, 523 U.S. at 80. Rather, allegations that a plaintiff's co-workers routinely call an individual a "faggot" or another derogatory term related to sexuality do not necessarily establish a claim for discrimination based on sex. *See Dawson v. Entek Int'l*, 630 F.3d 928, 937–38 (9th Cir. 2011) (holding that the district court did not err in granting summary judgment on employee's claims for sex hostile work environment under Title VII despite evidence that employee was repeatedly called a "homo" and a "fag" because employee failed to present evidence that he was being verbally harassed for appearing non-masculine or for otherwise not fitting the male stereotype); *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 764 (6th Cir. 2006) (holding that the plaintiff, who alleged that he was frequently called a "fag", "gay", and other derogatory names, did not establish that he was discriminated against because of sex stereotyping where he "failed to allege that he did not conform to traditional gender stereotypes in any observable way at work").[20] Similar to *Dawson* and *Vickers*, Plaintiff does not present any evidence that

---

[20] *See also E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 477 (5th Cir. 2013) ("Hence, in a same-sex case like this one, it makes no sense at all to affirm a verdict that a heterosexual male 'discriminated against' another heterosexual male by calling him names, which know not to be true by conduct or appearance. Name-calling may be bullying, but it isn't discrimination because the victim is a male."); *Hamm v. Weyauwega Milk Prod., Inc.*, 199 F. Supp. 2d 878, 892–95 (E.D. Wis. 2002), *aff'd*, 332 F.3d 1058 (7th Cir. 2003)

Deem's verbal harassment resulted from Plaintiff's failure to conform to male gender stereotypes. In the absence of any proof that the comments made by Deem were due to Plaintiff's gender, a reasonable trier of fact could not conclude that Plaintiff experienced a hostile work environment based on his sex. As Plaintiff is unable to prove this essential element of this claim, the Court grants summary judgment to Defendant on Plaintiff's hostile work environment claim based on sex.

### 2. Harassment Based on National Origin

Defendant does not specifically address Plaintiff's claim of harassment based on national origin from Deem's conduct in its Motion for Summary Judgment or in its Reply. (*See* Docs. 36; 44). Defendant merely says that Plaintiff's harassment claims are "factually unsupported" and "insufficient." (Doc. 36 at 1, 7). However, as to Plaintiff's claim that he was harassed based on his national origin by Deem, the Court disagrees. Viewing the evidence in the light most favorable to Plaintiff, as we must on summary judgment, *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), the Court finds that there is a genuine issue of material fact regarding whether Plaintiff was subjected to a hostile work environment by Deem based on his national origin.

National origin discrimination includes discrimination "because of an individual's, or his or her ancestor's, place of origin[.]" 29 C.F.R. § 1606.1; *see also Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973) (stating that "[t]he term 'national origin' [in Title VII] on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came"). Plaintiff is Mexican-American, (DSOF ¶ 67; PSOF ¶ 67), and indicated in his deposition testimony that he may have some Sicilian or Italian heritage, (Doc. 42-4 at 10, Plaintiff Depo., p. 206 at 1–12). Defendant nowhere disputes

---

(holding that evidence that male employee was harassed by fellow male employees by being called a "fag," "faggot," "homosexual," and a "homo" was insufficient to establish that employee was harassed "because of" sex under a sex stereotyping theory where employee failed to "provide evidence concerning what male stereotypes he failed to meet and [did] not cite any particular comments, actions, or other evidence . . . that his coworkers thought he behaved inappropriately for a man."); *Ianetta v. Putnam Investments, Inc.*, 183 F. Supp. 2d 415, 423 (D. Mass. 2002) (two instances in which male employee was called a "faggot" by his supervisor were insufficient to establish that employee was discriminated against because of his sex based on a gender stereotyping theory).

that Plaintiff, who is a Mexican-American, is a member of a protected class.

Plaintiff contends that Deem harassed him by calling him slurs based on Plaintiff's national origin, including "Italian n****r," and "wet back." (PSOF ¶ 95). According to Plaintiff, Deem called him these slurs "all the time," on a "daily basis," and stated that the slurs were "an ongoing thing." (PSOF ¶ 97). Plaintiff also alleges that Deem told him "several times" that he would call INS to have Plaintiff deported to Mexico. (PSOF ¶¶ 10, 96; DSOF ¶ 10; Doc. 35-1 at 39–40). The Court finds that Plaintiff has satisfied the first element of his prima facie case—that he was subjected to verbal conduct based on his membership in a protected class.

The Court also finds that Plaintiff has satisfied the second element of his prima facie case—that his work environment was subjectively offensive. Notably, CO II Flores told an ADC investigator that Plaintiff "just laughed" in response to Deem's comment regarding calling border patrol to deport Plaintiff to Mexico. (Doc. 35-1 at 71). Similarly, CO II Robertson stated that when he saw Deem "get up in CO II Villa[']s face" and "heard CO II Deem state to CO II Villa that I don't like your face and I just want to punch you in the face," he noted that both men were laughing at the time so he "thought they were kidding around." (Doc. 35-1 at 67). Nevertheless, Plaintiff's deposition testimony and the various complaints he submitted regarding Deem's conduct do suggest that the conduct was unwelcome, and that Plaintiff perceived the environment to be hostile and abusive. Further, Plaintiff presents the declaration testimony of Patrick Anderson, which indicates that Officer Anderson witnessed Plaintiff tell Deem "that isn't cool" after Deem referred to Plaintiff as a "faggot" and a "Sicilian n****r." (Doc. 42-6 at 23). In addition, Officer Anderson's declaration states that "Officer Kingsland also witnessed Deem's discriminatory comments to Officer Villa and remarked, "this isn't good." (*Id.*). Anderson and Kingsland's remarks tend to substantiate Plaintiff's claim that Deem's comments were not mere horseplay, but, rather, actionable harassment. "[T]he question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact[.]" *Meritor Sav. Bank, FSB*, 477

U.S. at 68. Accordingly, the Court finds that there is a genuine dispute of material fact as to whether the conduct was unwelcome.

Finally, the Court finds that Plaintiff has presented sufficient evidence demonstrating the third element of his prima facie—that the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. Plaintiff alleges that Deem called him an "Italian n****r" and "wet back" "all the time," on a "daily basis," and stated that the slurs were "an ongoing thing." (PSOF ¶¶ 95, 97). Further, Plaintiff alleges that Deem told him "several times" that he would call INS to have him deported back to Mexico. (PSOF ¶ 10, 96; DSOF ¶ 10; Doc. 35-1 at 39–40). When asked at his deposition how many times Deem used the word "n****r", Plaintiff responded "several times," "many times," and then estimated about "30 times." (Doc. 42-2 at 13, Plaintiff Depo., p. 48, l. 5–13). On at least two occasions, other officers witnessed Deem's harassment of Plaintiff. Specifically, Officer Anderson witnessed Deem call Plaintiff a "Sicilian n****r," (Doc. 42-6 at 23), while Officer Flores recalled an incident where Deem made some sort of racial comment to Plaintiff along the lines of calling border patrol to deport Plaintiff to Mexico, (Doc. 35-1 at 71). It also appears that Officer Kingsland may have witnessed Deem call Plaintiff a "Sicilian n****r." (Doc. 42-6 at 23). Although it is clear that "[n]ot every insult or harassing comment will constitute a hostile work environment," "[r]epeated derogatory or humiliating statements . . . can constitute a hostile work environment." *Ray*, 217 F.3d at 1245.

Deem's responses to Sgt. Tyrrell during the Fact Finding Investigation also corroborate Plaintiff's allegation that Deem called him a "Sicilian n****r" to an extent. Specifically, when asked by Sgt. Tyrrell whether he had ever had a conversation with Plaintiff to which Plaintiff could have possibly taken offense, Deem stated:

> One time I heard him talking to an inmate in Spanish. I asked him if he was Mexican. He stated no he was Italian. I said oh my wife is Italian. He said well actually I am Sicilian. I then said oh are you part black because the Africans invaded Sicily. He said no I'm part Arabic. And that was the end of the conversation.

(Doc. 35-1 at 63). Thus, it is clear that some conversation between Deem and Plaintiff about Plaintiff's Sicilian heritage and regarding Plaintiff potentially being part black did occur. However, it is up to the jury to decide whether Deem's or Plaintiff's version of this conversation is more credible.

Further, "[i]t is beyond question that the use of the word 'nigger' is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004). "This word is 'perhaps the most offensive and inflammatory racial slur in English, . . . a word expressive of racial hatred and bigotry.'" *Id.* (quoting *Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001) (ellipsis in original) (quotation marks omitted)). Given the inflammatory nature of these comments and the alleged frequency in which they allegedly occurred, the Court finds that Plaintiff succeeded in establishing a question of fact as to whether the work environment was objectively hostile.

In coming to this conclusion, the Court is guided by various precedent set within the Ninth Circuit. For example, the Court finds that the alleged harassment by Deem at issue is more severe and pervasive than that alleged by the plaintiff in *Vasquez v. County of Los Angeles*, where the Court concluded that the plaintiff had not alleged events "severe or pervasive enough to violate Title VII. 349 F.3d at 643. There, the plaintiff alleged a hostile work environment based on race when a manager made two derogatory statements to the plaintiff during a six-month period. *Id.* at 643.The statements were that plaintiff had a "typical Hispanic macho attitude," and that the plaintiff should transfer to a field position because "Hispanics do good in the field." *Id.*

Likewise, the alleged harassment by Deem here is more severe and pervasive than the conduct alleged by the plaintiff in *Mendoza v. Sysco Food Servs. of Arizona, Inc.*, where the court determined that the plaintiff failed to raise a genuine dispute of material fact as to his hostile work environment claim. 337 F. Supp. 2d 1172, 1190 (D. Ariz. 2004). There, at least four alleged instances of discrimination based on national origin occurred within a

five-month period involving stereotypical remarks after the plaintiff killed a rat, a cartoon of a rat having sex with other rats, a supervisor's comments regarding Mexican employees' unreliability during the Christmas season, and a co-worker's complaints that the plaintiff left his radio tuned to a Mexican radio station. *Id.* at 1187–90. The district court found that the plaintiff failed to sufficiently allege that the conduct complained of was persistent or severe enough to alter the conditions of his employment because the incidents were isolated in nature, the cartoon was not intended to be shown to the plaintiff, there were no physical threats or humiliation, and there was no evidence that the plaintiff's work performance declined as a result of the alleged harassment. *Id.* In contrast, here, Plaintiff does allege that Deem physically threatened him, and contends that Deem harassed him daily—not on an infrequent, isolated basis. (PSOF ¶¶ 97, 108, 113),

Rather, the conduct of which Plaintiff complains far more closely resembles the harassment at issue in *Carlson v. Partners*, No. 2:13-CV-378 JCM PAL, 2014 WL 4798467, at *7 (D. Nev. Sept. 26, 2014), and *Valdez v. Big O Tires, Inc.*, No. CV-04-1620-PHX-JAT, 2006 WL 1794756, at *2–*8 (D. Ariz. June 27, 2006), than *Vasquez* or *Mendoza*. In *Carlson*, one of the plaintiffs was a Hispanic female who alleged that she "experienced frequent offensive racial remarks and conduct, at times almost daily." *Carlson*, 2014 WL 4798467, at *7. The alleged comments made to this plaintiff included statements by Caucasian coworkers that the plaintiff "needs to go back to Mexico," that the coworker "couldn't stand Mexicans," and that the coworker was "going to take [Carlson's] green card." *Id.* Based on these comments, the district court determined that the plaintiff had proffered enough examples of alleged racial conduct to support a claim of hostile environment. *Id.*

In *Valdez*, the Mexican-American plaintiff alleged that his supervisor repeatedly referred to him as a "wetback," "sand nigger," "stupid Mexican," "dumb Mexican," "lazy Mexican," "illegal alien," "spic" and "stupid ass beaner," among other racial epithets and derogatory remarks. *Valdez*, 2006 WL 1794756, at *3. According to the plaintiff, the supervisor made these offensive racial slurs about Mexican-Americans on a daily basis. *Id.*

*7. Because the alleged comments occurred frequently and were of a highly offensive nature, the court determined that the plaintiff had set forth a genuine issue of material fact as to whether he was subjected to a hostile work environment. *Id.* at *3, *7. Similar to *Carlson* and *Valdez*, Plaintiff alleges that Deem harassed him based on his Mexican-American heritage on a daily basis. (PSOF ¶ 97). Not only was Deem's alleged harassment frequent, but it was severe—in the form of calling Plaintiff a "Sicilian n****r" and threats to have Plaintiff deported to Mexico. (PSOF ¶¶ 95–96).

A review of the record reveals that a genuine factual dispute exists as to whether Deem's conduct was sufficiently severe or pervasive to create an objectively hostile work environment due to harassment based on national origin. Nevertheless, Plaintiff's claim that he was subjected to a hostile work environment can only survive summary judgment if Plaintiff can raise a genuine dispute of fact as to whether Defendant failed to take prompt and effective remedial measures in response to Plaintiff's complaints of discrimination.[21]

### 3. Retaliation-Based Hostile Work Environment

Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees" because that employee "has opposed any practice made an unlawful employment practice" by Title VII, "or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). In order to make out a prima facie case of retaliation, the plaintiff must establish that he engaged in a protected activity under Title VII, that he suffered an adverse employment action, and that there is a causal link between the two. *Vasquez*, 349 F.3d at 646; *Brooks*, 229 F.3d at 928.[22] "[A]n action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir.2000).

---

[21] *See supra* Section III.C.

[22] Should the plaintiff make a showing sufficient to satisfy his prima facie case, the burden then shifts to the employer to advance legitimate, non-retaliatory reasons for any adverse actions taken against the plaintiff. *Steiner*, 25 F.3d at 1464. Should the employer meet this burden, the plaintiff has the ultimate burden of showing that the employer's proffered reasons are pretextual. *Id.*

"Under this definition, the universe of potential adverse employment actions for retaliation claims is larger than the universe of potential tangible employment actions that can subject an employer to vicarious liability for harassment." *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 965 (9th Cir. 2004) (citing *Ray*, 217 F.3d at 1242–44 & n.5). Indeed, the Ninth Circuit has recognized "retaliation-based hostile work environment" as a viable claim for relief under Title VII. *Ray*, 217 F.3d at 1245; *Elvig*, 375 F.3d at 965.

Plaintiff has satisfied the first element of his prima facie case for retaliation. Asserting one's civil rights—which Plaintiff did by complaining of Deem's conduct through his EEOC charge and through an informal complaint to his supervisor (Sgt. Abker)— is a protected activity under Title VII. *Ray*, 217 F.3d at 1240 n.3 ("[F]iling a complaint with the EEOC is a protected activity. . . . Making an informal complaint to a supervisor is also a protected activity."); (*see* PSOF ¶¶ 99-100; Doc. 42-5 at 5). At issue, however, is whether Plaintiff can meet the other elements of his prima facie case.

In order to satisfy the second element of his prima facie case for retaliation-based hostile work environment, Plaintiff must demonstrate that the harassment was sufficiently severe or pervasive as to constitute an adverse employment action. *See Powers v. Arizona Dep't of Corr.*, No. CV-13-00988-PHX-NVW, 2014 WL 3734132, at *6 (D. Ariz. July 29, 2014) ("Fostering a hostile work environment can constitute the adverse employment action necessary to support a retaliation claim.").[23] A hostile work environment can be the basis for a retaliation claim if the harassment is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ray*, 217 F.3d at 1245 (citing *Harris*, 510 U.S. at 21). To prevail on a retaliation claim, the plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in [the retaliation] context means it well might have dissuaded a reasonable worker from making or supporting a charge of

---

[23] *See also Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 446 (2nd Cir. 1999) ("co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy the second prong of the retaliation *prima facie* case"); *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1264 (10th Cir. 1998) ("co-worker hostility or retaliatory harassment, if sufficiently severe, may constitute 'adverse employment action' for purposes of a retaliation claim").

discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). "To determine whether an environment is sufficiently hostile, we look to the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Ray*, 217 F.3d at 1245 (internal quotations omitted) (citations omitted).

Plaintiff alleges that Deem harassed him in retaliation for filing the September 25, 2014 complaint against him by calling him a "paper dropper," a "snitch," "gay," a "chomo," and a "liar." (Doc. 35-1 at 117; PSOF ¶¶ 37, 133). According to Plaintiff, Deem would harass him "through other employees," (Doc. 35-1 at 117, 122), by telling other officers that Plaintiff is a paper dropper and should have been transferred instead of him, (*id.* at 33). Defendant contends that Plaintiff is unable to meet his prima facie burden on his claim of harassment based on retaliation because the comments Deem allegedly made were insufficient to create a hostile environment. (Doc. 36 at 9). When asked by Lt. Swirsky during one of the internal investigations if Deem had "said or done anything to you that you perceived as retaliation since the first case," Plaintiff responded "no." (Doc. 35-1 at 122; DSOF ¶ 41). Rather, Plaintiff told Lt. Swirsky that a third party had told Plaintiff that Deem had been calling Plaintiff a "paper dropper" and saying that Plaintiff couldn't be trusted. (Doc. 35-1 at 122; PSOF ¶ 41). Although Plaintiff stated that he was being harassed by Deem "through other employees," Plaintiff couldn't tell Lt. Swirsky who these employees were. (Doc. 35-1 at 122).

Even so, the Court finds that Plaintiff has presented evidence creating a genuine issue of material fact as to whether Deem's retaliatory conduct was sufficiently severe or pervasive as to have altered Plaintiff's working conditions. Plaintiff claims that Deem called him these slurs on a "daily basis" and "all the time." (PSOF ¶ 97). "Repeated derogatory or humiliating statements, . . . can constitute a hostile work environment." *Ray*, 217 F.3d at 1245. Moreover, Deem alleges that the retaliatory conduct was physically threatening. Although Deem was reassigned to another position within the Lewis prison,

Plaintiff avers that he still "ran into him on a daily basis." (PSOF ¶ 125). On one occasion after Deem was reassigned, Plaintiff alleges that Deem threateningly pointed his finger at him. (PSOF ¶ 127). Plaintiff also asserts that Deem would clench his fists and glare at Plaintiff when he saw him. (PSOF ¶ 129). According to Plaintiff's March 30, 2015 internal complaint, Plaintiff felt physically and mentally stressed whenever he would run into Deem at work after he was reassigned, especially because Deem had threatened to punch him in the past. (Doc. 35-1 at 117).

Further, Plaintiff claims that he became concerned for his physical safety as a result of Deem's slurs. Specifically, Plaintiff avers that inmates told him that they heard he was a "chomo," a "paper dropper," and a "snitch," causing Plaintiff to fear that he would be physically assaulted based upon these accusations. (PSOF ¶ 133; Doc. 43 at 17); *see Black v. City & Cty. of Honolulu*, 112 F. Supp. 2d 1041, 1052 (D. Haw. 2000) (finding a genuine issue of material fact as to whether alleged acts of harassment of female employee after she filed sexual harassment charges against male supervisor changed conditions of her employment where evidence reflected that employee feared for her and her children's safety because of the alleged retaliation). Taking this evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has satisfied his burden as to this second element of his prima facie case for retaliation-based hostile work environment.

Plaintiff also meets the third element of his prima facie case. "Causation can be proven by direct evidence of retaliatory motivation or it may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the activity and the allegedly retaliatory employment decision." *Black*, 112 F. Supp. 2d at 1052 (citing *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir. 1986)). Here, the record contains evidence that Plaintiff's supervisors were aware of Plaintiff's complaints alleging harassment by Deem. Moreover, the evidence shows that the retaliatory harassment by Deem took place shortly after Plaintiff filed his internal complaint with ADC. (*See* Doc. 35-1 at 117). Not only has Plaintiff established a "causal link between his protected activity

and the adverse employment actions by demonstrating that each action was implemented close on the heels of his complaints," *Ray*, 217 F.3d at 1244, but the use of the term "paper dropper"—which is prison slang for someone who reports misconduct—also suggests that Plaintiff was being retaliated against because he filed internal complaints with his employer. Accordingly, the Court finds that Plaintiff had presented evidence sufficient to meet his prima facie case.

In Title VII retaliation cases, once the plaintiff has established a prima facie case, the burden of production shifts to the defendant employer to articulate a legitimate, nonretaliatory explanation for its adverse employment action. *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir. 1986). Should the employer carry this burden, the plaintiff must then show that the asserted reason was a pretext for retaliation. *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982). Here, Defendant has failed to meet its burden of articulating a legitimate, nonretaliatory reason. (*See* Docs. 36; 44). As Plaintiff has made a showing sufficient to demonstrate a genuine dispute of material fact as to whether Deem's conduct created a hostile work environment based on retaliation, the Court now considers whether Defendant reasonably responded to Plaintiff's complaints.

**C.      Whether Defendant Responded Reasonably to Plaintiff's Complaints**

In light of the Court's conclusion that there is a genuine dispute of material fact as to whether the conduct of Plaintiff's coworker, Deem, created a hostile work environment based on national origin harassment and retaliation, the Court must next decide whether Defendant may be liable for this harassment. "When harassment by co-workers is at issue, the employer's conduct is reviewed for negligence." *Nichols*, 256 F.3d at 875 (citing *Ellison*, 924 F.2d at 881).

"Once an employer knows or should know of [coworker] harassment, a remedial obligation kicks in." *Fuller*, 47 F.3d 1522, 1528 (9th Cir. 1995) (citing *Steiner*, 25 F.3d at 1464 (when an employee is [] harassed, the "only question is whether [the employer] is relieved of liability for [the harasser's] actions because it took sufficient disciplinary and remedial action in response to [the employee's] complaints."). "That obligation will not be

discharged until action—prompt, effective action—has been taken." *Id.* "[T]he extent of the discipline depends on the seriousness of the conduct." *Intlekofer v. Turnage*, 973 F.2d 773, 780 (9th Cir. 1992). When evaluating the effectiveness of the remedy, the court may take into account the remedy's ability to "persuade individual harassers to discontinue unlawful conduct" and "persuade potential harassers to refrain from unlawful conduct." *Ellison*, 924 F.2d at 882. If "no remedy is undertaken" or "the remedy attempted is ineffectual, liability will attach." *Fuller*, 47 F.3d at 1528–29.

Here, there is a genuine dispute of material fact as to whether Defendant reasonably responded to Plaintiff's complaints of Deem's harassing conduct. Despite mentioning them as witnesses to the alleged harassment in his September 25, 2014 internal complaint, ADC failed to interview Officers Kingsland, Phillips, or Trinity Young. (Doc. 35-1 at 39–40, 62–68). ADC also failed to interview Officers Anderson, Kingsland, and Young in response to Plaintiff's March 30, 2015 complaint. (Doc. 35-1 at 117, 121–26). Defendant does not provide any explanation for its failure to interview Officers Kingsland, Phillips, and Trinity Young anywhere in the record. "The failure to interview witnesses is evidence of inadequate remedial action." *Mockler v. Multnomah Cty.*, 140 F.3d 808, 813 (9th Cir. 1998) (citing *Fuller*, 47 F.3d at 1529).

When asked at oral argument why ADC failed to interview these three individuals, Defendant responded that ADC interviewed those individuals who Plaintiff alleged had witnessed Deem call him by the n-word. This does not appear to be true, however. Plaintiff explicitly indicates in his September 25, 2014 information report that Deem called him a "Sicilian niger [sic]" in front of Robertson and Trinity Services Young. (Doc. 35-1 at 40). However, ADC never interviewed Trinity Young. At oral argument, Defendant sought to excuse this deficiency by pointing out that Trinity Young was not a state employee. Regardless, Trinity Young still witnessed the alleged harassment, and a reasonable jury could find that ADC's failure to interview her was evidence of inadequate remedial action. *Mockler*, 140 F.3d at 813. Moreover, Plaintiff's September 25, 2014 information report indicates that Officer Kingsland witnessed Deem tell Plaintiff that he was going to call INS

to deport him to Mexico, and tell Plaintiff "your [sic] Sicilian your [sic] Black." (Doc. 35-1). As Plaintiff clearly pointed out in this information report that Kingsland may be able to substantiate the alleged severe harassment he faced at Deem's hands, a reasonable jury could also find that ADC's failure to interview Kingsland demonstrates that ADC did not take effective remedial action. Defendant's failure to interview all of Plaintiff's witnesses could signal to its employees—as well as a jury—that Defendant fails to take complaints of discrimination and harassment seriously.

As to Officer Anderson, Defendant claims it "had no reason to interview Anderson" because Plaintiff "did not list Anderson as a witness in his initial complaint against Deem or mention Anderson in his interview." (Doc. 44 at 6). Because Plaintiff's second complaint "mentioned Anderson in relation to the old allegations" referred to in the initial complaint, Defendant claims that the investigator decided, instead, to focus "her attention on the new allegations, which contained no mention of Anderson." (*Id.*). The Court does not think this excuses ADC's obligation to interview all witnesses which Plaintiff set forth in his internal complaints, especially given the severity of the harassment alleged. ADC's failure to interview Officer Anderson is particularly significant, as Officer Anderson would have substantiated Plaintiff's claim that Deem called him a "Sicilian n****r." (Doc. 42-6 at 23). It also appears that Officer Kingsland would have substantiated Plaintiff's claims if ADC had interviewed him, as well, as Anderson mentioned that Kingsland witnessed Deem call Plaintiff a "Sicilian n****r." (Doc. 42-6 at 23). Had ADC completed its investigation by interviewing these witnesses, ADC might have concluded that Plaintiff's complaints established discriminatory harassment.

ADC's response to Plaintiff's complaints is similar to that of the defendant in *Fuller v. City of Oakland*, where the Ninth Circuit determined that the defendant's investigation was inadequate and did not constitute adequate remedial action. 47 F.3d at 1529. There, the court observed that the defendant "accepted [the alleged harasser's] version without taking reasonable and easy steps to corroborate that version," and failed to interview a witness favorable to the plaintiff. *Id.* Moreover, when the defendant found evidence which

contradicted the harasser's version of events, that evidence was not given sufficient weight. *Id.* Following *Fuller*, the Court finds that a reasonable jury could determine that Defendant's investigation, which also failed to consider witnesses and evidence favorable to Plaintiff, was inadequate.

As there is a genuine dispute of material fact as to whether Defendant reasonably responded to Plaintiff's complaints, the Court denies Defendant's Motion for Summary Judgment as to Plaintiff's hostile work environment claims alleging harassment based on national origin and retaliation by Deem.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

**IV.    CONCLUSION**

For the reasons set forth above,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. 36) is **GRANTED IN PART** and **DENIED IN PART**.

Defendant's Motion for Summary Judgment is **GRANTED** as to Plaintiff's:

a.    constructive discharge claim;

b.    hostile work environment claim alleging physical and verbal harassment by Sgt. Barreras;

c.    hostile work environment claim alleging harassment by Deputy Warden Hibbard;

d.    claim that ADC failed to promote him to a full-time position on the fire crew in retaliation for filing complaints of discrimination; and

e.    hostile work environment claim alleging sexual harassment by CO II Deem.

Defendant's Motion for Summary Judgment is **DENIED** as to Plaintiff's:

a.    hostile work environment claim alleging harassment based on national origin by CO II Deem; and

b.    retaliation-based hostile work environment claim resulting from CO II Deem's conduct.

The Clerk of the Court shall not enter judgment at this time.

Dated this 25th day of April, 2019.

_____
James A. Teilborg
Senior United States District Judge